Karl Anthony SMETANA, Appellant,

v.

The STATE of Texas, Appellee.

No. 12–97–00014–CR.

Court of Appeals of Texas,
Tyler.

Aug. 27, 1998.

Discretionary Review Refused
Jan. 13, 1999.

Mark W. Hale, Chandler, TX, for appellant.

Edward J. Marty, Tyler, TX, for appellee.

Before RAMEY, C.J., HOLCOMB, J. and HADDEN, J.

HOLCOMB, Justice.

Karl Anthony Smetana ("Appellant") appeals a murder conviction in which the jury assessed his punishment at ninety-nine years' imprisonment. He was indicted for intentionally murdering his mother, Margaret L. Hewes ("Hewes"), or by committing an act clearly dangerous to human life which resulted in her death. The fact that he killed her is not contested. He entered a plea of not guilty because of insanity. Appellant complains in three issues that the trial court abused its discretion when it failed to suppress the introduction of a videotape confession, that the evidence was insufficient to show that Appellant was not insane at the time of the offense, and that the court erred when it did not include the lesser included offense of criminally negligent homicide in the charge of the court. We will affirm.

 First, we will examine the issue of whether the evidence was sufficient to show Appellant was not insane at the time of the offense. Insanity is an affirmative defense which the defendant must prove by a preponderance of the evidence. Tex. Pen.Code Ann. §§ 2.04, 8.01 (Vernon 1994). It is a defense if "the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." Because the burden of proving insanity as an affirmative defense is borne by the defendant, the courts will hold the evidence factually insufficient only if the judgment is "so against the great weight and preponderance of the evidence as to be manifestly unjust." *Meraz v. State,* 785 S.W.2d 146, 155 (Tex.Cr.App.1990).

 Legal insanity is not strictly a medical issue. Experts may help the jury in their determination, but they cannot dictate their conclusions. They are left to accept or reject, in whole or in part, the opinion testimony of medical or psychological experts and can accept lay testimony over that of experts. *Graham v. State,* 566 S.W.2d 941 (Tex.Cr.App.1978). As an appellate court, when faced with conflicting inferences, we must presume that the trier of fact resolved any such conflict in favor of the verdict and must defer to that resolution. This gives effect to the rule that the jury can choose to believe or disbelieve witnesses or any portion of their testimony, and may believe a witness even though he is contradicted. *Turro v. State,* 867 S.W.2d 43, 47 (Tex.Cr.App.1993); *Bogan v. State,* 837 S.W.2d 422, 427 (Tex. App.—Beaumont 1992, no pet.). Keeping in mind these principles of law we now review the evidence presented at trial which, with the exception of the insanity issue, was largely uncontradicted.

Hewes was a math teacher at Boulter Middle School in Tyler, Texas. At approximately 6:00 a.m. on May 17, 1996, Appellant and Hewes began arguing about missing batteries from the television remote control. A neighbor reported that he heard two people speaking in an argumentative manner, although he could not testify to what was being said. He identified Appellant as one of the two people. Another neighbor reportedly saw Appellant place a duffle bag into Hewes' car and drive away shortly after the argument.

When Hewes failed to arrive at school or notify the school office of her absence or tardiness, school officials attempted to contact her by phone. Receiving no answer, the attendant clerk and a substitute teacher drove to her home. When no one answered the door, concerned co-workers called Hewes' younger son, Jason Smetana, who came home to see if his mother was inside the house. After crawling through a window, he located his mother lying on the hallway floor, dead. It was later determined that the cause of Hewes' death was strangulation, although she had sustained other injuries as well. The vest, which was used to strangle her, was found lying near the body. The police were

called to the home, who commenced a crime scene investigation. There were several unusual things about the condition of the body and the surrounding area which were noted and photographed by investigators. Coins were on the eyes of the decedent, a Bible was at her feet, an alarm clock was proximate to her body, and playing cards and tobacco were scattered around her. The significance of these things became clear as the trial progressed. There was testimony that Hewes had at least one conflict with Appellant concerning his unwillingness to get out of bed in the morning. Hewes had made it a practice to set the alarm clock just inside Appellant's bedroom door in an apparent attempt to get him out of bed. Also, she forbade smoking in the house, which was a source of contention between mother and son since Appellant was a smoker. Hewes was very religious and she believed that Appellant was possessed by Satan. She was convinced that he would be lost if he did not embrace her religious beliefs. Hewes attempted to impose these beliefs on both of her sons.

Appellant became the primary suspect in the homicide, and a bulletin was issued which identified him, as well as the vehicle which law enforcement officials believed he was driving. The following day, Officer Pat Goldthorn ("Goldthorn") of the Wood County Sheriff's Department, was patrolling Highway 37 at approximately 5:50 a.m. On a previous pass, he had noticed a car parked on the side of the road. Shortly thereafter, Goldthorn saw Appellant, wrapped in a blanket, walking along the highway. When the officer approached him, Appellant identified himself as "Mortis" and said that he had run out of gas. Goldthorn ran a routine check of the license plate number and discovered that it was the suspected getaway car used in a murder in Smith County. He was also informed that the son of the victim, Appellant, was the primary suspect. Goldthorn arrested Appellant without incident and placed him in the Wood County jail. Later that morning, Officers Eric Liptak and

Derrick Waggoner of the Tyler Police Department and Dennis Murphy ("Murphy") of the FBI drove to Wood County to transport Appellant back to Smith County. On the trip, Appellant spoke with the officers about the offense. He later gave a videotaped interview in which he admitted to killing his mother and explained how he did it and why. He interspersed his confession with talk of demons, demon possession and witches and called himself by an imaginary name.

The first expert witness presented by the State on the issue of sanity was Dr. Willard Gold ("Gold"), an M.D. at Terrell State Hospital. Dr. Gold interviewed Appellant on June 19, 1996, after viewing the case file and videotaped interview. During the course of the interview, he performed a mental status examinations in order "to reach, if possible, a diagnosis of mental illness and then reconstruct what his probable state of mind was at the time of the instant offense." The doctor examined Appellant and observed and analyzed his appearance, attitude, motor activity affect, mood, speech, thought processes, thought content, self-perception, orientation, memory, cognitive function, abstraction, judgment and insight. At the conclusion of the examinations, Gold diagnosed Appellant with schizotypal and antisocial personality disorders. He classified the schizotypal disorder as being a severe personality disturbance; however, Gold later opined that Appellant's mental illness or defect did not prevent him from knowing that what he was doing was wrong. He also testified that, in his opinion, Appellant was malingering or pretending a mental disorder.

Appellant's father, stepmother and a friend were called by the defense to testify about Appellant's mental instability. Each described various instances when they had witnessed Appellant exhibiting strange and unusual behavior. On one occasion, Appellant's friend Malcolm Gray ("Gray") observed Appellant standing on a second floor balcony, leaning over the banister

and waving his arms for approximately two and a half hours. Gray also saw Appellant confronting cars while wearing a trench coat and boots and carrying a sword on a hot summer day. Several months before Hewes' death, Gray, Appellant's father and stepmother all observed Appellant's nearly demolished apartment in Virginia which had holes in the walls and debris lying about.

Patrick Gordon Lawrence ("Lawrence"), a correctional psychologist for the University of Texas Medical Branch, Correctional Health Care System, testified for the defense. In forming his opinion that Appellant was insane at the time of the offense, he reviewed the videotape, conducted tests, interviewed family members and read the files and grand jury transcript. He conducted the Revised Beta Examination to evaluate nonverbal problem solving skills, the Memory for Designs Test for screening out neuropsychological difficulties, the Rey's 15 Figures Test to screen out "malingering," the Personality Assessment Inventory to determine attitudes and beliefs about life, and the Sentence Completion Test to ascertain attitudes and beliefs. Lawrence also performed the Disassociative Experiences Scale and the Hare Psychopathy Checklist, Revised, along with the M test, which also evaluate the possibility of malingering. Lawrence concluded that Appellant did not know that his conduct was wrong at the time of the offense. He testified that Appellant "was operating in a somewhat unreal world around him, that he was mentally ill, acutely, severely mentally ill." Lawrence described the characteristics of paranoid schizophrenia, and opined that Appellant manifested these characteristics at the time of the conduct. He also stated that he did not believe Appellant was "malingering."

Dr. Jerry Landrum, Ph.D. ("Landrum") also testified for the defense on the sanity issue. He claimed to have conducted approximately 10,000 clinical sanity evaluations during his career. "Several hundred" of those evaluations required his testimony in court, and on only three occasions did he testify on behalf of the defense. Landrum concluded that Appellant was legally insane at the time of the offense after he reviewed the videotape, various records, and performed several psychological tests in face-to-face interviews. These tests included the Minnesota Multiphasic Personality Inventory, which is a 500–plus item personality test that helps evaluate the extent of depression, paranoia, lying, physical problems, schizophrenia, manic depressive disorders and variety of other things. He also conducted the Brief Psychiatric Rating Scale, which is used to evaluate personality characteristics. Landrum diagnosed Appellant with "a very severe mental disease or defect, very, very severe." He also opined that Appellant "was so severely disturbed that he quite obviously did not know that the behavior was wrong at the time of that conduct."

On rebuttal, the State called Dr. Thomas Allen, Ph.D. ("Allen") and Dr. Tynus McNeel, M.D. ("McNeel") to testify concerning Appellant's sanity. Allen had reviewed the videotape, police reports, and personally interviewed Appellant on two occasions. Based upon the interviews, it was his professional opinion that Appellant was not insane at the time of the offense. Allen's belief was based upon his subjective evaluation and not upon any tests that he himself conducted. He had, however, reviewed the tests given by Lawrence and Landrum and disputed their conclusions. McNeel also reviewed police reports, grand jury testimony, the videotape and interviewed Appellant for approximately an hour and a half, without conducting any objective tests. He diagnosed Appellant with a "moderately severe" personality disorder, but it was his opinion that Appellant was sane on the date of the offense.

Appellant argues that, given the testimony heard by the jury concerning his mental condition prior to, during and after the death of his mother, the defense

proved insanity by a preponderance of the evidence. Consequently, the jury's finding was against the "great weight and preponderance of the evidence" and the conviction should be overturned and the case remanded for a new trial. We do not agree.

Appellant did present evidence of bizarre behavior, as well as lay and expert opinion evidence that he was insane at the time he killed his mother. There was also, however, lay and expert testimony that while Appellant had personality disorders, he was not legally insane when the incident took place. The jury's responsibility was to determine whether Appellant's evidence or the State's evidence was more credible and the weight to be given to that evidence on the one issue that mattered: whether Appellant, as a result of mental defect or illness at the time he murdered his mother, he did not know that his conduct was wrong. The jury could have believed that Appellant truly embraced demonology, white and black rites, belief in witches and warlocks, etc., as a result of his extensive reading and study on the subject, but that he retained the mental capacity to conform his actions to the law. The jury could have considered Appellant's flight from the crime scene as evidence of awareness of guilt and the disavowal of his statement as evidence of an attempt to deceive. We conclude that there was sufficient evidence to refute Appellant's affirmative defense so that the jury's verdict was not so against the great weight and preponderance of the evidence as to be manifestly unjust. We overrule Appellant's second point of error.

■ In his first point of error, Appellant alleges the trial court abused its discretion when it failed to suppress the videotape confession. During trial, the State introduced the tape and published it to the jury after a hearing on its admissibility. The crux of Appellant's argument is that the statement was involuntary, since it was not knowingly or intentionally made. Appellant supports this contention with evidence that his behavior was erratic at best, and that he spent the night in the woods consuming at least eighteen beers twenty-four hours prior to his arrest. Appellant did not testify, but on May 21, 1996, four days after the killing, he made the following statement at a hearing, which we quote in part:

I was not in the right state of mind to even consider what they were asking me or what I was telling them or any that— the facts and forms. And I was—I had gone through a really traumatizing experience, and I've just woken up. And I've been locked up and everything like that. Everything was confused in my mind. I didn't understand my right. I didn't understand any of it. So I just want to make sure you knew that before any of that was used against me. Because until the last day or two, I've been in a dazed state of mind, and I have not been able really to even to think about what happened and what happened to me, you know. And I just blabbed off whatever I could, you know, and just went on. I did not know what I was doing, so I just did, you know.

Appellant argues that if the term "voluntary" is to have any meaning in the context of a confession, then the defendant must be capable of understanding his rights and the gravity of his decision to make such a statement in order to give the waiver any force and effect. Appellant complains that he did not have the mental capacity to understand his rights or the gravity of relinquishing his rights when he gave the statement to the investigators. In light of the circumstances of the instant case, and Appellant's subsequent assertion in open court, the FBI agent's mere conclusion that Appellant "intelligently, knowingly and freely and voluntarily" waived his Miranda rights was insufficient to overcome the burden placed upon such waiver by the Fourteenth Amendment.

■ It is well settled that the use of an involuntary confession is deemed to be

a violation of the due process clause of the Fourteenth Amendment to the United States Constitution. *Blackburn v. State of Alabama*, 361 U.S. 199, 205, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960). When reviewing a motion to suppress, the evidence must be viewed in the light most favorable to the ruling. *Green v. State*, 615 S.W.2d 700, 707 (Tex.Cr.App.1980), *cert. denied*, 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981). The trial court is the sole judge of the credibility of the witnesses, and its ruling on admissibility will not be reversed absent a clear abuse of discretion. *Werner v. State*, 711 S.W.2d 639, 643 (Tex.Cr.App. 1986). As an appellate court, we should afford almost total deference to a trial court's determination of the historical facts which the record supports, especially when the trial court's fact findings are based upon an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Cr.App.1997). And we should also afford the same amount of deference to trial courts' rulings on "mixed questions of law and fact," if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Id.* Appellate courts should only conduct a *de novo* review of "mixed questions of law and fact" when credibility is not at issue. *Id.*

We have examined the contents of Appellant's confession and much of it was nonsensical and bizarre, with numerous references to warlocks, spells and magical powers. But Appellant also related, although not always logically, why and how he killed his mother and where he went after he had finished. During the interview, Appellant appeared to alternate between calm and methodical and agitated and angry. He ended the interview when he accused the officer of being possessed. Murphy testified that he observed Appellant giving his statement and that he did not appear to be under the influence of drugs, alcohol or sleep deprivation. He also stated that Appellant appeared to understand his rights and knowingly and voluntarily waived those rights when he confessed. He did agree with defense counsel, however, that Appellant's behavior was unusual. But Appellant simply argued mental impairment and offered no evidence to controvert Murphy's statements. The trial court ruled that all provisions of law had been met and the statement was freely, knowingly, and voluntarily made.

Appellant's argument that the confession was not voluntarily given solely because of evidence of mental illness has been addressed by the United States Supreme Court in *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The lower court held that on the basis of expert testimony, the defendant suffered from a psychosis that interfered with his free and rational choice, motivating his confession and rendering it involuntary. It held so in spite of the fact that the police had adequately warned the defendant and had done nothing coercive to secure the confession. The Supreme Court reversed and remanded, concluding that coercive police activity is a necessary predicate to finding that a confession is not "voluntary" within the meaning of the Due Process Clause. *Id.* at 162, 107 S.Ct. 515. Taking respondent's statements and admitting them into evidence constituted no violation of that Clause. *Id.* at 167, 107 S.Ct. 515. While a defendant's mental condition may be a "significant" factor in the determination of "voluntariness," this does not justify a conclusion that his mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional "voluntariness." *Id.* at 157–58, 107 S.Ct. 515.

In the present case, there was no evidence that the Appellant's statement was coerced or that his Fourteenth Amendment rights were otherwise violated. After reviewing the evidence *de novo,* we conclude that the trial court did not abuse its discretion in finding Appellant's statement was voluntarily given in light of the officer's testimony. Simply because Ap-

pellant offered bizarre answers to some of the questions did not make it involuntary. Appellant's point of error number one is overruled.

In Appellant's third point of error, he claims that the trial court erred when it overruled his motion to charge the jury on the lesser included offense of criminally negligent homicide. Appellant contends that although he did not testify, the jury still had the opportunity to see and hear him on video. And various witnesses, including the expert witnesses who interviewed him, all testified to his out-of court statements. According to Appellant, enough testimony was elicited from these sources that inclusion of the lesser included offense in the charge was mandated.

Appellant specifically observes that the video was convoluted, bizarre, incoherent and, at times, an incomprehensible jumble of words used to describe what took place before, during and after he killed his mother. In his confession, he stated in part:

> You know, I did that and she just went, she just totally lost her control of her mind and the demons just all rammed into her. There was 26 major demons; all the pedophile demons, all the gay demons, the defiled men demons, the defiled women demons, the defiled children, the defiled society, the defiled earth demons, all major 26, fucking, hateful demons of the world were in her ... I tightened it up and I was like, you all are going to die! I pulled it tight, I tied one knot, tied, one knot is like here, tied, two knots, and tied three knots and they were dead. But they were still making that damn re-run noise ... Okay, once I had beaten her and once I had known there is no words, when you know a demon dies, it goes, awwwww, and that is it. An uh, okay, so I killed all 26 major, ruthless demons in the world right then, and that was it. I was so damn happy.

In addition, Dr. Gold testified to portions of Appellant's story which were communicated to him during the psychological examination:

> He then is kneeling on his mother's back—has her turned around with his hand on the back of his mother's neck, and she is screaming. He wears a humpback whale vest and initiates hearing a witch's voice from her. He takes the vest and ties it around her neck and *left enough room for her to breathe* unless she was possessed. (emphasis ours)

And Dr. Allen testified that Appellant told him that after he killed his mother he tried to do CPR on her, since he wasn't trying to kill her, but just knock her out. And he also said that he didn't want her dead because she was his mother. Similarly, Dr. McNeel reported Appellant to have said "I inadvertently killed my mother." Appellant argues that the above out-of-court statements at least raise the issue that he did not fully comprehend his actions or the consequences of those actions. In other words, he did not know that what he was doing would necessarily result in his mother's death.

If the facts presented at trial raise the issue of a lesser included offense and a jury charge is properly requested, then a charge on the issue must be given. *Mitchell v. State*, 807 S.W.2d 740, 742 (Tex.Cr.App.1991). A two-step analysis is required to determine whether the evidence raises a lesser included offense: (1) the lesser offense must be included within the proof necessary to establish the offense charged; and (2) there must be some evidence, from any source that raises a fact issue on whether the defendant is guilty of only the lesser offense. *Ramos v. State*, 865 S.W.2d 463, 465 (Tex.Cr.App. 1993). Anything more than a scintilla of evidence is sufficient to entitle Appellant to a charge including the lesser offense. *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Cr.App.1994). To determine whether Appellant is entitled to a charge on a lesser included offense, the court must consider all of the evidence introduced at trial, whether produced by the State or the de-

fendant. *Banda v. State,* 890 S.W.2d 42, 60 (Tex.Cr.App.1994). Also, entitlement to a jury charge on a lesser included offense must be made on a case-by-case basis, according to the particular facts of that case. *Livingston v. State,* 739 S.W.2d 311, 336 (Tex.Cr.App.1987).

A person is guilty of criminally negligent homicide if he causes the death of a person by criminal negligence. TEX. PEN.CODE ANN. § 19.05(a) (Vernon 1994). Criminal negligence as a culpable mental state is determined as follows:

> A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct *when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur.* The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. (emphasis ours)

TEX.PEN.CODE ANN. § 6.03(d) (Vernon 1994). As to whether the charge of criminally negligent homicide is required in a particular case, the record must contain evidence showing that the defendant was unaware of the risk[1], or that he failed to perceive the risk created by his conduct. *Thomas v. State,* 699 S.W.2d 845, 851 (Tex. Cr.App.1985). The record must affirmatively show an unawareness of risk before a charge on criminally negligent homicide is required. *Mendieta,* 706 S.W.2d at 653.

Appellant asserts that there was sufficient testimony to at least raise the issue that he was criminally negligent when he killed his mother. We disagree. The testimony did not illustrate that Appellant was unaware of the risk, but that he disregarded the risk. Appellant's statement to Dr. Allen showed that he was trying to "knock her out." His statement to Dr.

Gold also showed that he understood and was aware of the "risk" of strangulation because he left "enough room for her to breath ..." And Appellant's statement to Dr. McNeel demonstrates that Appellant knew he was chocking his mother. None of the statements suggest that Appellant was unaware that if he strangled his mother, he ran the risk of killing her. In viewing the evidence in the light most favorable to Appellant's theory, there is only a suggestion that he might have disregarded a risk. There is *nothing* in the record that shows Appellant was unaware of the risk. Appellant's third point of error is overruled.

Finding no reversible error, the judgment of the trial court is ***affirmed.***

---

1. *Mendieta v. State,* 706 S.W.2d 651, 653 (Tex. Cr.App.1986).