Darron Tray Moss v. State
















IN THE
TENTH COURT OF APPEALS
 

No. 10-98-001-CR

     DARRON TRAY MOSS,
                                                                              Appellant
     v.

     THE STATE OF TEXAS,
                                                                              Appellee
 

From the 82nd District Court
Falls County, Texas
Trial Court # 7047
                                                                                                               
 
O P I N I O N
                                                                                                               
 
      A jury convicted Darron Tray Moss of “intentional” murder. See Tex. Pen. Code Ann. §
19.02(b)(1) (Vernon 1994). The court assessed punishment at 99 years' imprisonment. Moss
appeals on six issues, asserting that the court erred in charging the jury, in allowing inadmissible
evidence, and in asking him questions during punishment. We will affirm the judgment.
SUMMARY
      The charges arose from a shooting on December 7, 1996, outside the Booker T. Washington
Alumni building in Marlin. Moss and Willie Earl Solomon were attending a birthday party. 
Approximately 100 people were at the party, including the victim, Marcus Davis. Both alcohol
and marihuana were prevalent. Around 11 p.m., a fight broke out between Davis and several
men, including Moss and Solomon. Several witnesses testified that the men “ganged up” on
Davis. In the parking lot, Davis again encountered Moss and Solomon. Moss shot Davis in the
head at close range.
THE TESTIMONY
      Eleece Hughes testified that it was her birthday party. Some time after 11 p.m. a fight broke
out. She saw Davis being kicked by a “gang of guys,” which included Moss. Hughes told the
disc jockey to stop playing music and told the guests the party was over. Davis left the building
but returned within a few minutes to apologize to Hughes. She told him that he had to leave.
      Connie Kelly testified that she saw Moss, Solomon, and another man “ganging up” on Davis
in the fight inside the building. When she tried to help break up the fight by pulling Moss away,
he fell on top of her. Connie stated that she did not feel a gun on Moss. After the fight, she saw
Davis standing by his car. Connie testified that Solomon was talking to Davis when Moss
“whip[ped] the gun up to the boy's head and shot him.” She stated that Davis had his hands in
his pockets at the time of the shooting.
      Christine Kelly, Connie's sister, described the shooting: “[Moss] had the gun pointed towards
his forehead, telling him to drop out, and [Davis] had his hands in his pocket[s]. He wasn't saying
nothing, and after that, he just shot him. He just pulled the trigger.” Christine testified that Moss
had pulled the gun from his jacket. When Davis fell to the ground, Solomon “picked his
pockets.” Moss walked past Christine and dropped the gun near the corner “saying he didn't do
anything.” He then picked the gun back up and put it in his jacket.
      Sheila Childers, another witness to the shooting, testified: “I heard Darron Moss tell [Davis]
to drop out. He had gone to his head and told him to drop out, and [Davis] was standing up there
with his hands in his pockets, and then [Moss] pulled the trigger.” 
      Larry Massington testified that he helped break up the fight inside the building. He told Davis
to go home “because something else might end up happening,” but Davis wanted to go apologize. 
Massington did not witness the shooting. He testified that Moss helped him put the wounded
Davis into the car, and that Moss asked, “What happened to him?” and “Who shot him?”
      Eric Ellison, Davis' cousin, testified that he and Davis arrived at the party together. They
were inside for ten to fifteen minutes before going outside to meet some girls. He testified that
the fight broke out “over these girls.” In the parking lot after the fight, Ellison grabbed Davis by
his jacket trying to get him to leave. Ellison testified that Solomon was verbally encouraging
Moss to “shoot them both.” Davis went back into the building and then returned where he again
encountered Moss and Solomon. Ellison testified that Solomon was standing behind Davis, and
Moss was standing in front of him. Moss told Davis to take his hands out of his pockets “and just
that second he turned and shot him right in the head.” Moss then walked away from the scene. 
Ellison followed him until Moss “showed me his pistol like if you keep following me, I'll do
something to you, too.” He testified that Davis was not carrying a weapon. Ellison took Davis
to the hospital in Marlin. He stated that Moss did not help put Davis into the vehicle.
      Moss testified that he had begun drinking around 1 p.m. and had continued drinking
throughout the day. At the party, he smoked “sweets,” cigars laced with marihuana. Moss stated
that he was drunk and did not know whether he had shot Davis. When asked about the events that
night, he repeatedly answered, “I don't know, I was drunk.” He also stated, “I did not want to
kill nobody.” Moss testified that he did not own a gun and had no training in gun use. He did
not recall going to another club after the shooting.
      Shannon Suiters testified that the fight broke out inside the building when Davis stepped on
his foot and bumped a plate of food out of his hands. Suiters asked for an apology, and a fight
ensued between the two. Two men with Davis joined in the fight, and one of them had a
switchblade knife. Suiters did not know which of the men had the knife. The fight lasted two or
three minutes, and then all the men were asked to leave.
      The medical testimony indicated that Davis had been shot at close range, no more that two
to three feet away and possibly much closer. His blood-alcohol level was .17. 
APPLICATION PARAGRAPH
      Moss' first issue asserts that the court erred in failing to give an application paragraph as to
“knowingly” causing the death of Davis. The charge contained an instruction which defined
“knowingly” and “intentionally” but the application paragraph only referred to “intentionally
causing the death” of Davis. Moss did not object to the omission in the application paragraph. 
The State responds that Moss' failure to object waives the complaint. Also, it argues that because
the indictment did not allege “knowingly,” the omission from the charge was not erroneous, citing
Posey v. State, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998) (omission of unrequested defensive
issue is not “error” under Almanza


).
      A person commits murder if he “intentionally or knowingly causes the death of an
individual.” Tex. Pen. Code Ann. § 19.02(b)(1). Moss was indicted for “intentionally caus[ing]
the death of an individual, namely: Marcus Davis, by shooting the said Marcus Davis in the head
with a firearm.” 
      The jury charge contained definitions for both “intentionally” and “knowingly”:
A person acts intentionally, or with intent, with respect to a result of his conduct when
it is his conscious objective or desire to cause the result.
A person acts knowingly, or with knowledge, with respect to a result of his conduct when
he is aware that his conduct is reasonably certain to cause the result.

The application paragraph stated:
 
Now, if you find from the evidence beyond a reasonable doubt that on or about the 8th
day of December 1996 in Falls County, Texas, the defendant DARRON TRAY MOSS, did
intentionally cause the death of an individual, namely, MARCUS DAVIS, by shooting him
with a firearm, to wit, a gun, and that said gun was then and there a deadly weapon as set
forth in the indictment, then you will find the defendant, DARRON TRAY MOSS, guilty of
murder as charged in the indictment.

      Article 36.14 of the Code of Criminal Procedure requires that the court submit to the jury “a
written charge distinctly setting forth the law applicable to the case.” Tex. Code Crim. Proc.
Ann. art. 36.14 (Vernon Supp. 1999). We assume that the “knowingly” instruction should not
have been included in the charge. However, Moss did not object. The Court of Criminal Appeals
has recently reaffirmed the Almanza “egregious harm” analysis for unobjected-to charge error. 
See Barrera v. State, 982 S.W.2d 415, 417 (Tex. Crim. App. 1998). The application paragraph
tracked the indictment and correctly applied the law to the facts. Dooley v. State, 1998 WL
823687 (Tex. App.—Tyler 1998, pet. filed). The charge did not authorize the jury to convict
Moss of the offense under a theory which is not authorized by the Penal Code. We do not find
that the error was so egregious and created such harm that Moss did not have a fair and impartial
trial. Id. We overrule issue one.
LESSER INCLUDED OFFENSE
      Moss' second issue asserts that the court erred in failing to give his requested instruction on
the lesser included offense of criminally negligent homicide. Tex. Pen. Code Ann. § 19.05
(Vernon 1994). Determining the propriety of a lesser included offense instruction requires a two-step analysis. Rousseau v. State, 855 S.W.2d 666, 672-73 (Tex. Crim. App. 1993). First, the
lesser-included offense must be included within the proof necessary to establish the offense
charged. Id. at 672. Second, there must be some evidence in the record that would permit a jury
rationally to find that if the defendant is guilty, he is guilty of only the lesser offense. Id. 
      Both parties agree that negligent homicide is within the proof necessary to establish the
offense of murder, thus satisfying the first prong of Rousseau. Id. The parties disagree on
whether there is any evidence that would permit a jury to rationally find that Moss is guilty of only
negligent homicide. 
      As to whether the charge of criminally negligent homicide is required in a particular case, the
record must contain evidence showing that the defendant was unaware of the risk or that he failed
to perceive the risk created by his conduct. Smetana v. State, 1998 WL 648151 (Tex.
App.—Tyler 1998, no pet. h.) (citing Mendieta v. State, 706 S.W.2d 651, 653 (Tex. Crim. App.
1986), and Thomas v. State, 699 S.W.2d 845, 851 (Tex. Crim. App. 1985)). It is not enough that
the jury may disbelieve crucial evidence pertaining to the greater offense; there must be some
evidence directly germane to a lesser included offense for the factfinder to consider before an
instruction on a lesser included offense is warranted. Reeves v. State, 969 S.W.2d 471, 487 (Tex.
App.—Waco 1998, pet. ref'd) (citing Skinner v. State, 956 S.W.2d 532, 543 (Tex. Crim. App.
1997)).
      Moss contends that the following evidence raised the issue of criminal negligence: (1) Connie
Kelly testified that she did not feel a gun when Moss fell on her during the fight inside the
building; (2) Larry Massington testified that Moss helped put Davis into the car after the shooting
and that Moss was asking, “Who shot him?” and “What happened to him”; and (3) Moss testified
that he was drunk and did not remember the events, that he had never wanted to kill anyone, and
the he did not own a gun or have any training in guns.
      Although Moss testified that he did not intend to kill anyone, neither that evidence nor that
of the other witnesses raises the issue of whether Moss failed to perceive the risk that, by shooting
a gun point-blank at a person’s head, death was likely to occur. See Burnett v. State, 865 S.W.2d
223, 228-29 (Tex. App.—San Antonio 1993, pet. ref'd). Moss' testimony that he was drunk and
could not remember the events is not a defense and does not negate his culpable mental state. 
Tex. Pen. Code Ann. § 8.04 (Vernon 1994); Skinner, 956 S.W.2d at 543-44. We overrule issue
two.
SELF-DEFENSE
      Moss' third issue asserts that the court erred in failing to give his requested jury instruction
on self-defense based on apparent danger. A person is justified in using deadly force: (1) if he
is justified in using “force”; (2) if a reasonable person in his situation would not have retreated;
and (3) when and to the degree he reasonably believes the deadly force is immediately necessary
to protect himself against the other's use or attempted use of unlawful deadly force. Tex. Pen.
Code Ann §§ 9.31, 9.32 (Vernon 1994 & Supp. 1999). The jury should be instructed on self-defense if the evidence raises the issue. Riddle v. State, 888 S.W.2d 1, 6 (Tex. Crim. App.
1994). 
      Moss asserts that the issue of self-defense was raised through the testimony of Shannon Suiters
who testified that either Davis or one of the two men who came to his defense brandished a
switchblade during the fight inside the building. Moss also points to evidence that Davis refused
to leave and went back inside the building, that Davis had his hands in his pockets immediately
before the shooting, and that he and Solomon had told Davis to take his hands out of his pockets. 
Even if this constituted some evidence that Davis had a knife, there was no evidence that he was
wielding the weapon in such a manner as to prevent Moss from leaving the scene. See id. A
reasonable person would have retreated without using deadly force and, therefore, Moss was not
entitled to an instruction on self-defense. Id.; Tex. Pen. Code Ann. § 9.32. We overrule issue
three.
EXCLUSION OF TESTIMONY
      Moss' fourth issue asserts that the court erred in excluding the testimony of a criminal
investigator. Eric Ellison testified that the fight in the building was “over these girls” who had
come to the party with Davis but was not caused by any “flirting” by the young women. Under
article 38.36 of the Code of Criminal Procedure, Moss sought to rebut this testimony with that of
Don Youngblood, a criminal investigator who had spoken to Ellison by telephone prior to trial. 
Tex. Code Crim. Proc. Ann art. 38.36 (Vernon Supp. 1999). Out of the jury's presence,
Youngblood testified that Ellison had told him that the women had been “flirting with several
different folks . . . and refused to shoo away” and that this flirting had triggered the fight. The
court sustained the State's objection that the testimony was not relevant, did not show the
condition of Moss' mind, and did not prove any prior relationship between Moss and Davis. On
appeal, Moss argues that this evidence, which tends to show that the girls with Davis were flirting
with other men, would explain why the fight started and would allow an inference that Davis
started the fight because he was upset with the women. Moss limits his complaint to an assertion
that the evidence was relevant.
      In a murder prosecution, the court should allow evidence of all relevant facts and
circumstances surrounding the killing, the previous relationship between the accused and the
deceased, and the accused's state of mind. Id. Evidence is "relevant" if it has "any tendency to
make the existence of any fact that is of consequence to the determination of the action more
probable or less probable than it would be without the evidence." Tex. R. Evid. 401. Questions
of relevance should be left largely to the trial court, relying on its observations and experience. 
Moreno v. State, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993) (citing Montgomery v. State, 810
S.W.2d 372, 391 (Tex. Crim. App. 1990)). We will not reverse absent an abuse of discretion. 
Id.
      Ellison had testified that the fight began because of the “girls” but not because they were
“flirting.” We do not find that the court abused its discretion in disallowing the testimony as
irrelevant. We overrule issue four.
MOTION FOR MISTRIAL
      Moss' fifth issue asserts that the court erred in overruling his objections and his motion for
mistrial based on the “prosecution's repeated limine violations which elicited inadmissible
hearsay.” Prior to trial, Moss filed Motion in Limine No. 4, asking the court to instruct the
State's witnesses “not to make statements to the effect that: [1] after the shooting, people were
heard to say that the decedent had been shot by Darron Moss a.k.a. ‘Tootie’; [2] Prior to the
shooting, people were heard to say that there was going to be a shooting.” The court conducted
a pre-trial hearing on Moss' various motions. As to Motion in Limine No. 4, the court stated:
[I]f [the witnesses] were present, and they have personal knowledge of what they saw,
their testimony will be allowed. If they drew a conclusion from what other people said or
what other people heard, that's not going to be admissible. It has to be someone who was an
eye witness who had personal knowledge of what happened in the incident. However, I am
going to grant the State some latitude in developing the facts and circumstances around the
incident as it occurred.

The court signed a written order denying Motion in Limine No. 4. 
      Moss complains about two portions of the testimony. First, during the direct testimony of
Eleece Hughes, the witness was describing how Davis returned to the building after she had ended
the party, and she told him he had to leave:
      [STATE]:           How did he respond to that?
      [DEFENSE]:      Objection, calls for hearsay.
      THE COURT:     Overruled. 
      [STATE]:           I mean, was he mad about it or --
      [HUGHES]:        No, he was just like in shock why they had jumped on him.
      [STATE]:           He was in shock?
      [HUGHES]:        Just like I didn't do nothing.
      [DEFENSE]:      I object. This is speculation.
      THE COURT:     Overruled. 
      Second, during the testimony of Amanda Mendoza, the witness was describing how Davis left
the building after the fight:
      [STATE]:           Did you see [Davis] come back in?
      [MENDOZA]:    No.
 
      [STATE]:       How long did he step—what was the next thing you heard? Did you hear
anything?
 
      [MENDOZA]:   Me and Carla and Stephanie were getting ready to walk out, and Carla told
us not to go, because they were going to go get a gun.
 
      [DEFENSE]:     Your Honor, may we approach? . . . Your Honor, I want to object to the
question by [the State] with regard to the fact that it violated the Motion in
Limine that we asked for this morning. I want to ask that the jury be
instructed to disregard the question and the response, and I guess — well,
and then I will make my next request, I guess.
 
      THE COURT:    Okay. In view of the statement of the witness, the Court will overrule the
objection, but I instruct the State to caution the witness in the future since
no one was identified in the last statement that she mentioned.
 
      [STATE]:          Ms. Mendoza, the questions that I ask you—don't say—if you don't mind,
don't say what anybody else said unless I ask you that specifically, okay?
 
      [MENDOZA]:   Okay.
 
      [STATE]:          What—what did y'all—after Carla maybe made a statement, what did y'all
do then?
 
      [MENDOZA]:   We started walking about, somebody ran in and said he had been shot.
 
      [STATE]:          Don't—don't—
 
      THE COURT:    He just instructed you not to say what anybody else said.
 
      [DEFENSE]:     Your Honor, I would ask that the jury be instructed to disregard—
 
      THE COURT:    The jury is instructed to disregard the last statement of the witness. Now,
listen to the question very carefully and answer the question. Not what
anybody else said, just the question that the District Attorney said.
 
      [DEFENSE]:     I'm also going to request a mistrial.
 
      THE COURT:    Motion for mistrial denied.

      Moss argues that the statements were “rank hearsay” and allowed the jury to infer (1) that
self-defense was not an issue, and (2) that the shooting was premeditated and intentional. The State
responds that, because the court denied the motion in limine, the court did not err in denying the
motion for mistrial based on the prosecution's “repeated limine violations.” 
       Because the court denied the motion in limine, the State was not in violation of its terms. 
Even if the court had granted the motion, a motion in limine generally does not preserve a
complaint. Willis v. State, 785 S.W.2d 378, 384 (Tex. Crim. App. 1989). As to the motion for
mistrial, "[t]he asking an improper question, by itself, will seldom call for a mistrial." Hernandez
v. State, 805 S.W.2d 409, 413 (Tex. Crim. App. 1990). A mistrial is in order only "when the
question is 'clearly calculated to inflame the minds of the jury and is of such character as to
suggest the impossibility of withdrawing the impression produced on their minds.'" Id. Hughes
did not answer the original question, “How did he respond to that?”, which might have elicited
hearsay. Although the objection was overruled, the State rephrased the question to ask, “[W]as
he mad[?]” The State's question to Mendoza, “[W]hat did y'all do then?” was not calculated to
elicit Mendoza's hearsay response. The State had instructed Mendoza not to “say what anybody
else said” just before this exchange. The court instructed the jury to disregard Mendoza's
statement. 
      We have held in issue three that Moss was not entitled to a self-defense instruction. As to the
hearsay statements allowing the jury to infer that Moss' actions were intentional and premeditated,
there was ample other evidence from eyewitnesses that he shot Davis point-blank. Because the
instruction to disregard sufficiently cured any error, we cannot say that the court abused its
discretion in overruling Moss's motion for a mistrial. Kipp v. State, 876 S.W.2d 330, 339 (Tex.
Crim. App. 1994). We overrule issue five.
PUNISHMENT
      In his final issue, Moss complains that the court erred in questioning him during punishment. 
The jury found Moss guilty, and he chose to have the court assess punishment. At sentencing the
following exchange occurred:
      THE COURT:    This was a living, breathing, walking, functioning young man that you took
his life. Do you realize what you did in this case?
 
      [DEFENSE]:     Your Honor, I object to that. You're asking him to testify as to his guilt or
innocence on the record.

Moss did not respond to the court's question. The court—having reviewed the pre-sentence
investigation, the evidence adduced at trial, Moss' lack of remorse as shown by his testimony
during guilt-innocence, and his prior federal conviction for distribution of “crack” cocaine—
sentenced him to 99 years in prison. 
      Moss does not elaborate on how the court's question harmed him. He correctly states that 
the fact that he testified at guilt-innocence does not waive his right to remain silent at punishment. 
Beathard v. State, 767 S.W.2d 423, 431-32 (Tex. Crim. App. 1989). The State acknowledges
that a defendant who has pled not guilty is put in a dilemma upon conviction. Vaughn v. State,
931 S.W.2d 564, 566 (Tex. Crim. App. 1996) (such a defendant faces possible perjury charges
and waiver of error in guilt-innocence). We note, however, that the Court of Criminal Appeals
has recently overruled the “DeGarmo doctrine” which held that when a defendant admits guilt at
punishment “he waives any error that might have occurred during the guilt stage of the trial.” 
Leday v. State, 983 S.W.2d 713, 722-26 (Tex. Crim. App. 1998) (overruling DeGarmo v. State,
691 S.W.2d 657 (Tex. Crim. App. 1985)). 
      Because Moss did not answer the court's question and we do not find any harm, we overrule
issue six. 
      Having overruled all the issues, we affirm the judgment.
 
                                                                       BILL VANCE
                                                                       Justice

Before Chief Justice Davis,
          Justice Vance, and
          Justice Gray
Affirmed
Opinion delivered and filed May 12, 1999
Do not publish